PERRY NAVAL STORES COMPANY, A CORPORATION, *Plaintiff in Error*, v. WILLIAM D. GRIFFIN, *Defendant in Error*.

1. The action of unlawful detainer can not be used in the place of ejectment or trespass and the plaintiff to sustain it must show an actual possession of the premises sued for within a recent period before the wrong is done of which he complains. A possession which existed some years antecedent to the wrong done is not sufficient.

2. The fact that about four acres of a tract of three hundred and sixty acres of land is enclosed in the field of an adjoining

owner who is agent of the plaintiff is not evidence of the possession of the remainder which is not enclosed or cultivated.

3.  In unlawful detainer title deeds can only be used when a possession of a part of the land is shown for the purpose of showing the boundaries or extent of the possession claimed.

This case was decided by the court En Banc.

Writ of Error to the Circuit Court for Taylor County.

The facts in the case are stated in the opinion of the court.

. *W. D. Davis,* for Plaintiff in Error;

*L. W. Blanton,* for Defendant in Error.

Hocker, J.—On the 14th of September, 1908, William D. Griffin, the defendant in error, brought a suit of Unlawful Entry and Detainer against the Perry Naval Stores Company, in the Circuit Court of Taylor County. The declaration is in the statutory form (section 2157 General Statutes of 1906) and describes 360 acres of land by quarter sections, townships and range, and claims damages. At the October term of the court the case was tried before a jury, which rendered a verdict in the statutory form (section 2166 General Statutes of 1906) for the plaintiff for possession of the land and damages $368.00. A judgment was entered on this verdict, which is here for review on writ of error.

Mr. Griffin, the plaintiff, testified at length in his own behalf. He is the principal witness by whom he undertakes to prove his possession of the premises. He says among other things the folowing: "I have had from five to thirty-five acres of this land in cultivation for thirty

years, and have about five acres of it in cultivation now. That cultivation has been continuous since I first had possession of this land. With that part not under cultivation the 250 acres are in wood and pasture fences, and lately fenced up eighty acres of it and used it for a pasturage. I have used the timber on this land for any purpose I found necessary; for wood splitting and anything I wanted. The rights I have exercised average over I think 350 acres. The defendant did not go upon this land with my permission. When the defendant chopped the land my agent out there was sick, and not able to be up. He was bed ridden." "When these parties took possession I was in Madison county; in Greenville, thirty-five miles north of that land. J. L. Hampton was the agent I had out there at the time of the last chipping. He is dead. I think he died in June and at the time of the chipping when it was going on, he was an invalid unable to get out. Confined to his bed and died shortly afterwards. He lived, I suppose, all the way from half a mile and over, or three fourth I suppose. When I had possession of that land *sometime ago for pasturage* purposes I had an agent living on it for me, and I had a house on it and had some one in it. The first agent's name was Kelley, the next man's name was Hampton. I used it for corn and repairing as my agent in possession of the land and to mark and brand my cattle, and used the timber and wood for any purposes we desired. I had 450 acres under fence for pasturage and used for pasturing cattle. The first was destroyed by fire and afterwards I fenced 450 acres more of it. I did not build the pasture so large. I had four hundred and fifty acres more or less. I used the land for corralling my cattle, and I made a corn crop there to feed my stock. The land down there was largely used for pasturage. That is the purpose for which it is used.

Two hundred acres were used for pasturage, and between two hundred and two hundred and twenty-five acres used for raising potatoes. I made it general headquarters for cow hunters." On cross-examination he testified: "I don't accurately tell you when I sold my cattle down in Taylor county, because it was in the eighties. I cannot say just what year." "I think my agent has had for the last ten years from five to eight acres of this land cultivated. I think that the land that Hampton had in cultivation for me on this particular tract was not enclosed by the same enclosure that enclosed Mr. Hampton's field, and as well as I recollect there was a fence cutting off Mr. Hampton's territory, and the fence that enclosed my piece, I think joined that land. I am not positive, it has been long years since I was in there except in herding cattle."

Mr. W. W. Hampton, a son of Mr. J. L. Hampton, after testifying about a notice he gave Mr. Malloy to stop chipping the land, said: "He (meaning doubtless the plaintiff) used it for farming and pasturing cattle."

This is all the evidence bearing on the possession of the plaintiff offered by him.

Mr. J. F. King testified for the defendant that he was a surveyor and was on the land in January or February before it was turpentined. A plat of the land showing Mr. Hampton's field was filed in evidence. That when he was surveying the land he heard a conversation between Mr. Hampton and a Mr. Boyd, in which Hampton claimed the land for Mr. Griffin, and Boyd claimed it as his. "They said while they were talking that they were good friends and would not fall out over the dispute." "Mr. Griffin's land and his land and the Interstate People's land was all in dispute. Mr. King further testified that the zigzag lines on the map indicate as near as he could draw it the end of Hampton's

field; that just about four acres of N. E. ¼ of S. W. ¼ S. 13, Tp. 5, S. R. 7 E., one of the quarter sections described in the declaration was enclosed by Mr. Hampton's field; that there was no fence there indicating the dividing line between Hampton's enclosure and Mr. Griffin's; that he did not notice anything about the land that would indicate any one was in possession except the four-acres under fence, and that what was under Hampton's fence was all under fence, except a little fence a Mr. McCall had on it, taking in about two acres on the south side.

Mr. Malloy testified for the defendant that there was no one in possession of the land when it was being boxed except the small part in Mr. Hampton's field, and that when they first cut the boxes on the land he did not know any one claimed any interest in the turpentine on the land or turpentine privileges except the Perry Naval Stores Company; that he never stopped Mr. Hampton from using this land for any purposes that he knew of— never told him to stop, and that the Perry Naval Stores Company had a lease on these boxes for turpentine purposes. Mr. Malloy says that Mr. Hampton informed him that Mr. Griffin claimed the land after a few boxes had been cut and forbid him to cut boxes. This is the substances of all the evidence bearing upon the possession of the property upon the part of the plaintiff, Mr. Griffin.

The action of Unlawful Detainer is provided for by Chapter 1630 Laws of 1869, in an act entitled "An Act Concerning Forcible Entry and Detainer." (See General Statutes of 1906, §§ 2152 to 2169 inclusive).

This court held in Liddon v. Hodnett, 22 Fla. 271, that the statute applied in three classes of cases: 1. Where another enters in any case where entry is not given by law: 2. Where another enters with strong hand or multitude of people even

in case where entry is given by law; 3. Where another who has entered both lawfully and peacefully holds over after the expiration of his right and against the consent of the party entitled to possession. In this statutory action our statute provides that no question of title, but only a right of possession and of damages shall be involved in the action (section 2156 General Statutes of 1906). Title deeds can only be used when a possession of a part of the land is shown for the purposes of showing the boundaries or the extent of the possession claimed. Walls v. Endel, 17 Fla. 478. It seems to be the law that this action can be sustained only by proof of an actual possession of the premises sued for, held by the plaintiff prior to the unlawful entry. 5 Ency. of Ev. 775. In Alabama it is held that the plaintiff must show such actual possession as that if continued for the necessary period, the possession would vest in him a legal title against the true owner if there be such title outstanding. When the plaintiff cannot show such actual possession his remedy is in ejectment, and not in unlawful detainer." In Russell v. Desplous, 29 Ala. 308, that court in discussing the action of unlawful detainer says: "It is the law in this State, clearly set forth in several decisions, upon unassailable reasoning, that an actual possession is necessary to the maintenance of this action. The constructive possession which the law infers from the title is not sufficient to maintain it. If it were, a controversy as to title, which it is the purpose of the statute to avoid would inevitably arise," quoting authorities. The court further said: "A possession, which existed some years antecedent to the wrong done is not sufficient. The action is designed to redress a wrong done to the actual existing possession, which the legislature supposed required more immediate and speedy relief than could be obtained

through the ordinary forms of judicial proceeding." A scrambling possession is not sufficient to support this action.    Conroy v. Duane, 45 Cal. 597.

One of the assignments of error embraces the propositions that the verdict is contrary to the evidence, and against the weight of the evidence. A consideration of the evidence shows that the plaintiff some time "in the eighties" and before used the lands involved as a pasture, had some sort of a house on it, and raised some corn and potatoes, but it does not appear that he had used it for such purposes since. He claims that a small number of acres were under fence, but does not know whether it was separately fenced from Mr. Hampton's land, or embraced in his field. The surveyor who was on the land just before the defendants began boxing the timber saw no evidence of possession by any one of any part of the land except about four acres embraced in Mr. Hampton's field, and about two acres in Mr. McCall's field. No title deeds were introduced to show the extent of the possession claimed by the plaintiff. There was evidently a dispute between Mr. Griffin and others as to the ownership of the land. We do not think the evidence shows such possession on the part of the plaintiff as will support this action. It is not intended to be used as an action of tresspass or ejectment, but is a summary remedy to determine the question of the right of possession, and the plaintiff to sustain it must show possession within a reasonably recent period before the wrong is done of which he complains to sustain it. If the fact that about four acres of the land was enclosed in Mr. Hampton's field can be said to be evidence of Mr. Griffin's possession, we do not see, under the evidence how it could be called possession of the remainder of the 360 acres. The land was not fenced, and did not show any evidence of being in the possession of any one.

The judgment of the Circuit Court is reversed.

All concur.